LOTTINGER, Judge.
This is a suit filed by Mrs. Janice Marie Daigle, Individually and as natural tutrix of her minor child, Chadwick Edward Dai-gle, Jr., for damages resulting from the death of her husband, Chadwick Edward Daigle, Sr., as a result of an automobile accident. The defendants are Arnold F. Hess, Jr., and his liability insurance carrier, St. Paul Fire and Marine Insurance Company. The Lower Court awarded judgment in favor of defendants and against petitioner and dismissed petitioner’s demand. The petitioners have taken this appeal.
The record discloses that on the morning of October 13, 1969, defendant Hess, who was a deputy sheriff of Pointe Coupee Parish, was instructed by his superiors to patrol Louisiana Highway 416 because there were picket lines at the schools in Pointe Coupee Parish and speeding cars had been reported.
In the vicinity of the accident, the said highway runs in a generally east and west direction, it is a black top road, 18' in width and on the morning in question there had been a misty rain and the roadway was wet. Prior to the accident, Mr. Daigle was *295 proceeding in an easterly direction and Mr. Hess was proceeding in a westerly direction.
Mr. Hess, on being asked what action did he take and what did he do when he first saw the Daigle car, replied:
“When I saw him, sir, he looked like a whip coming around the curve and there wasn’t anywhere to go'. The further he would come my way, the more he was deviating on my side of the road. I remember when I braced — first I did like that and then I did like this (indicating with hands stretched out) and was more or less waiting. I think I applied the brakes, but I don’t know for sure. I feel sure that I did.”
Mr. Hess later testified as follows:
“For some reason or other I always remember seeing the back end of the vehicle. It might not have been the first thing I saw, maybe thats the first odd movement I saw, but I always remember seeing the back end of the vehicle start fishtailing around. From thereon he just proceeded down almost — down the road and as he got closer and closer to me, he was deviating off to my side of the road.”
Mr. Hess testified that when he first saw the Daigle vehicle, he was going 25 to 30 miles an hour which was a slow patrol because his superiors wanted the sheriff’s vehicle to be seen in the vicinity. Although he could not testify as to the speed of the Daigle vehicle, he estimated it to be in the neighborhood of 60 miles an hour.
In its reasons for judgment below, the Lower Court said:
“This is a suit for damages for the death of Chadwick Edward Daigle, Sr. resulting from a two-car automobile accident on Louisiana Highway 416 in Pointe Coupee Parish, Louisiana, at approximately 10:13 A.M. on October 13, 1969. The decedent was driving a 1966 Ford and the defendant driver, Arnold F. Hess, Jr., Deputy Sheriff, was driving a 1968 Plymouth owned by the Pointe Coupee Parish Sheriff’s Office. Both decedent and Hess were alone in their respective vehicles and there were no other witnesses to the accident. It had been raining and the highway was wet.
The positive and uncontradicted testimony of Mr. Hess is that he was proceeding westerly on the right or north side of said highway at approximately 25-30 miles per hour when he saw the Daigle car, which was coming easterly, fishtail across the highway in front of him and skid toward him at a high rate of speed. Because of the sudden emergency created by Mr. Daigle and the Daigle vehicle Mr. Hess is not absolutely certain of all facts that occurred thereafter; however, he is quite certain that he braced himself on the steering wheel and applied his brakes and had either stopped or nearly stopped on the right hand or north side of the highway when the Daigle car that was sliding down the highway sideways crashed into the front of his vehicle. Mr. Hess was injured quite seriously in the accident and Mr. Daigle was killed.
Sgt. Guerin of the State Highway Police testified that he arrived soon after the accident and after checking all factors concerning the crash concluded the above version given by Mr. Hess was true and correct.
Mr. Doyle, who testified as an expert automotive consultant, but who stated he was not an expert on reconstruction of auto accidents, proceeded to attempt to reconstruct this accident though he did not view the scene until long after the accident, nor did he see the Hess vehicle until even longer after the accident.
Because of a hole in the highway and other reasons used by him, Mr. Doyle testified he believed the point of collision to be approximately two feet south of the center line of the highway. However, he could not say what side of the *296 highway the Hess vehicle was on when the Daigle vehicle rounded the curve or when MR. Hess saw the Daigle car fishtail and this is of the utmost importance. He did concede that Mr. Hess could not have avoided the accident by being on the north side of the highway at the point of collision.
Mr. Canfield, expert, who did not check anything until two years after the collision concluded that the point of collision was from two to three inches south of the center line, but he did not know where the Hess vehicle was when Mr. Daigle rounded the curve or when the Daigle car fishtailed.
The Court believes the point of collision to have been on the north side of the highway. However, even if it be conceded that it was on the south side, Mr. Hess’ vehicle could have skidded there on the wet highway after he applied his brakes or if the brakes were not applied, he could have turned southward upon viewing the sudden emergency in an attempt to avoid the collision. The facts show that the highway was wet so no skid marks were found of either car. The Court is of the definite opinion that the collision was caused solely and only by the negligence of Mr. Daigle and that Mr. Hess was free of negligence. However, even if it is conceded that Mr. Hess may have been negligent, Mr. Dai-gle was certainly guilty of contributory negligence; therefore, plaintiff’s suit will be dismissed.”
Mr. Thomas Guerin, who had been a Louisiana State Patrolman for some sixteen years testified that because of the condition of the highway there were m> skid marks but there were certain gouge marks left on the highway as a result of the accident. He estimated the point of collision at approximately 200 feet from the center of the curve which the Daigle vehicle had just rounded prior to the impact. From the physical evidence found at the scene, he concluded that the Daigle vehicle was skidding sideways and partially obstructing the lane of travel at the time of its collision with the Hess vehicle.
Following the accident the Hess vehicle came to rest almost perpendicular to the highway with its front end resting just at the center line and its rear wheels on the northern shoulder of the highway. The Daigle vehicle came to rest a few feet down the highway (easterly) facing diagonally (south-easterly) of the highway with its two rear wheels completely off the blacktop and its front end in a private driveway. Only the left rear end of the Daigle vehicle protruded over the blacktop. According to the photograph the extreme right rear of the car was over the shoulder.
The major part of damages to the Hess vehicle was to the front end commencing just right of center to the left front. Photographs indicate the point of impact to the Hess vehicle as just to the right of front center. The major damages to the Daigle vehicle were from the front door to midway between the rear wheel and rear bumper. Photographs indicate that the point of impact to the Daigle vehicle was just to the rear of center of this two door vehicle.
Considering the locations at which the two vehicles came to rest after the accident as well as the damages to and the apparent point of impact to the two vehicles, it is apparent that the Daigle vehicle whipped or fishtailed across the highway into the Hess lane of traffic, thus causing the unfortunate accident, as testified to by Mr. Hess. This conclusion is fortified by the various marks discovered in the west or Hess lane of traffic following the accident.
Certainly, from the evidence introduced in the trial of this matter, it is apparent to us that the Lower Court was correct in holding that the driver of the Daigle vehicle was negligent and that such negligence was the cause of the accident. We do not feel that any negligence was shown on the part of Mr. Hess, however, had *297 any been produced, certainly Mr. Daigle would have been guilty of contributory negligence.
Subsequent to the filing of this suit, the defendants filed a motion to transfer the suit from the Parish of East Baton Rouge to the Parish of Pointe Coupee, alleging that neither the petitioner nor her minor child is domiciled in the Parish of East Baton Rouge, that the accident sued upon occurred in the Parish of Pointe Coupee, that the defendant himself resides in Pointe Coupee Parish, and that the sole basis for the venue of the suit in East Baton Rouge is the fact that the defendant, St. Paul Fire and Marine Insurance Company has as its legal agent the service of process, the Secretary of State of Louisiana. Following hearing of the rule, the Court of the Parish of East Baton Rouge transferred the matter to the Eighteenth Judicial District Court for the Parish of Pointe Coupee, pursuant to Article 123 of the Louisiana Code of Civil Procedure which provides as follows:
“For the convenience of the parties and the witnesses, in the interest of justice, a district court upon contradictory motion, or upon the court’s own motion after contradictory hearing, may transfer a civil case to another district court where it might have been brought, provided, however, that no suit brought in the parish of which the plaintiff is domiciled, and which court is otherwise a court of competent jurisdiction and proper venue, shall be transferred to any other court pursuant to this article.”
Said Article 123 was passed as Section 1 of Act 294 of the Louisiana Legislature of 1970 and originated as House Bill 92 of said Legislature. It is now contended by the petitioner that the Lower Court erred in transferring the venue of this suit because of the fact that said act is unconstitutional.
Said contention on part of the petitioner is based upon the fact that the calendar of the Legislature reports that House Bill 92, on May 11 was read by title; on May 12 was read by title and referred to the Committee on Judiciary, Section A; on June IS was reported unfavorably; on June 16 was withdrawn from the files of the House; on June 21 rules were suspended, bill reconsidered and recommitted to the Committee on Judiciary, Section A; on June 23 reported with the amendments; on June 24 read by title, amended, ordered engrossed and passed to its third reading; on June 30 read third time in full, roll called on final passage, yeas 63, nays 17, finally passed, title adopted, ordered to senate.
It is claimed by the petitioner that on June 16 when the House Bill 92 was withdrawn from the files of the House, this was the end of it and as at that time, the time for submitting new bills in the legislature had been passed, that on June 21 when the rules were suspended and the act was reconsidered and recommitted to committee it became a new bill, not the same one. Petitioner maintains that when it was withdrawn on June 16, there was no longer a House Bill 92.
Article 3, Section 10 of the Constitution of this State provides that each of the houses of the Legislature shall determine the rules of its own procedure. This bill was never rejected by a vote of the House of Representatives. The official journal of the House of Representatives shows that on June 21, 1970, under a suspension of rules, the vote by which the House Bill 92 was withdrawn from the files of the House was reconsidered and it was recommitted to the Committee of Judiciary, Section A. We feel that plaintiff’s contention that Article 123 of the Code of Civil Procedure is unconstitutional is without merit.
For the reasons hereinabove assigned, judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by petitioner.
Judgment affirmed.